ORDERED.

Dated:  December 21, 2018

Karen S. Jennemann
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

| | |
|---|---|
| In re: | Case No.: 6:15-bk-07275-KSJ |
| | Chapter 11 |
| PROGRESSIVE PLUMBING, INC. | |
| | |
| PROGRESSIVE SERVICES, LLC and | Jointly Administered with |
| GRACIOUS LIVING DESIGN | Case No. 6:15-bk-07276-KSJ |
| CENTER, INC., | Case No. 6:15-bk-07277-KSJ |
| | |
| Debtors. | |
| _____/ | |
| PROGRESSIVE PLUMBING, INC., | |
| | |
| Plaintiff, | |
| | |
| v. | Adversary Proceeding No. |
| | No. 6:16-ap-00078-KSJ |
| KAST CONSTRUCTION III, LLC, a Florida | |
| limited liability company, and MICHAEL | |
| MACDONALD, an individual, | |
| | |
| Defendants. | |
| _____/ | |

## MEMORANDUM OPINION AND
## PARTIAL JUDGMENT FOR PROGRESSIVE PLUMBING

Debtor, Progressive Plumbing ("Progressive"), specializes in complicated commercial plumbing installations required by high rise hotels, offices, and residential buildings. Defendant, Kast Construction III ("Kast"), is a large general contractor who builds high-rise structures. Kast

hired Progressive as its plumbing sub-contractor on at least two projects—one in St. Petersburg and the other in North Palm Beach ("NPB"). Defendant Michael MacDonald was Kast's Senior Project Manager on the NPB project.

Debtor brought this adversary proceeding against Kast claiming it is owed for work completed on these two projects and that Kast failed to return a "Booster Pump" used to maintain water pressure on the NPB project.[1] After considering the evidence introduced at a two day trial[2] and the parties' legal arguments, I will enter a Partial Judgment in favor of Progressive and against Kast $240,124 and conclude Mr. MacDonald has no personal liability to Progressive. The Court will allow the parties to submit additional briefing and affidavits on Progressive's entitlement to attorneys' fees and costs before a Final Judgment can issue.

<u>**Stipulated Facts**</u>

Here are the parties' agreed facts in their own words:[3]

1.    Progressive is a commercial plumbing contractor.

2.    Kast is a general contractor.

3.    MacDonald is an employee and senior project manager of Kast.

4.    Domani Development, LLC ("Domani"), is the owner of the NPB Project.

5.    Robert "Bob" Vail ("Vail") is a member of Blue-Sky Family Investments, LLC, which is a member of Kast and Domani.

6.    Domani is the owner and developer of the real estate and improvements known as The Water Club – North Palm Beach, Florida (the "NPB Project").

---

[1] Progressive asserts six counts in its Complaint: Counts I and II request the turnover and a finding of conversion as to the Booster Pump, Counts III and IV assert breach of contract claims relating to the St. Petersburg and NPB projects, Counts V and VI assert fraudulent inducement and negligent misrepresentation claims against Kast and Mr. MacDonald individually for false or negligent promises made to induce Progressive to continue working on the NPB Project when Kast lacked the intention to pay for their services.

[2] The trial was held on August 15 and August 16, 2018.

[3] Doc. No. 71.

7.     Domani hired Kast as the general contractor of the NPB Project.

8.     MacDonald served as Kast's project manager for the NPB Project.

9.     Progressive and Kast entered into a subcontract agreement for plumbing subcontractor services at the NPB Project (the "NPB Contract").

10.    The NPB Contract was executed by both parties by January 14, 2015, for a total contract value of $4,684,257.

11.    Kast approved Progressive's schedule of values at the time of signing the NPB Contract.

12.    Progressive began performing plumbing subcontractor services at the NPB Project on October 19, 2014.

13.    The NPB Contract required Progressive to procure a bond.

14.    Progressive requested its surety to furnish a letter of bondability. Progressive provided a letter of bondability to Kast dated October 29, 2014.

15.    On January 28, 2015, Progressive notified Kast and MacDonald it could not obtain a bond for the NPB Project.

16.    On January 30, 2015, MacDonald, on behalf of Kast, sent a letter to Progressive stating that the failure of Progressive to secure bonding in 48 hours "shall constitute a default" under the NPB Contract (the "Default Letter").

17.    On March 5, 2015, Bill Lawson, Sr., with Progressive attended a job coordination meeting on site at the NPB Project. MacDonald and other subcontractors also attended the meeting.

18.    MacDonald requested updates and information on vendor orders on February 20, 2015.

19.    MacDonald discussed with Progressive changes in Progressive's payment applications.

20.    The changes in the payment applications would result in a smaller amount due to Progressive than under the terms of the NPB Contract.

21.    The payment applications submitted by Progressive were amended to be equal to actual labor and materials in place or stored on site plus 20%.

22.    On February 26, 2015, MacDonald approved Progressive's pay applications.

23.    On March 9, 2015, Kim Sapp emailed MacDonald inquiring when payment would be made by Kast to Progressive.

24.    Progressive continued to perform plumbing subcontractor services for the NPB Project through March 10, 2015.

25.    Progressive submitted $239,550.30 in pay applications to Kast prior to Kast's termination of the NPB Contract.

26.    MacDonald approved Progressive's pay applications.

27.    Kast verbally terminated the NPB Contract on or about March 10, 2015, and sent a letter of termination dated March 13, 2015 (the "Termination Letter").

28.    Kast replaced Progressive with Pinnacle Plumbing, Inc. ("Pinnacle") as the subcontractor to complete the plumbing services for the NPB Project.

29.    Kast requested Pinnacle submit a bid via email on February 11, 2015.

30.    MacDonald intended the scope of the subcontract with Pinnacle to be identical to Progressive's scope of work in the NPB Contract.

31.    Pinnacle and Kast entered into a contract for plumbing services on the NPB Project with the total contract price of $4,822,399.00 (the "Pinnacle Contract").

32.    Progressive submitted change orders in at least $121,964.95.

33.    The guaranteed maximum price for the NPB Project was raised by $230,388.00 pursuant to authorized Owner Change Order #6 ("Change Order Amount") submitted by Kast.

34.    Domani approved Change Order #6 and the Change Order Amount was added to the value of the contract between Domani and Kast.

35.    Pinnacle was paid a total of $4,960,237.80 for its work on the NPB Project.

36.    Kast received from Domani at least $4,960,237.80 with which to pay Pinnacle for its work on the NPB Project.

37.    Kast did not pay to Progressive under the NPB Contract on the NPB Project.

38.    Progressive owned and utilized a custom-built temporary booster hydraulic pump based off of a 2008 Vickery Model 1VC-G-TH(X) (the "Booster Pump") during its work on the NPB Project.

39.    Progressive filed for Chapter 11 bankruptcy relief August 28, 2015.

40.    Progressive did not retrieve its Booster Pump from the NPB Project site.

41.    Prior to the NPB Contract, the parties entered into a subcontract agreement dated May 20, 2013, for plumbing subcontractor services at The Water Club in St. Petersburg, Florida (the "STP Contract") the STP Contract.

42.    Prior to the commencement of the NPB Project, there were payments due to Progressive pursuant to the STP Contract.

43.    Progressive never obtained a bond.

44.    Progressive never applied for a letter of credit to serve in lieu of a bond.

45.    At the time of its presence on the NPB Project, Progressive was in financial distress.

## Kast Owes Progressive $185,594.63 under the NPB Contract

Now, I will try to put the parties' dispute into simpler language and analyze the evidence as it relates to the legal claims and defenses. The Water Club is a luxury condominium project on the Intracoastal Waterway in North Palm Beach primarily consisting of 19-story buildings each containing condominium units plus other villas, smaller buildings, pools, and opulent amenities. Kast, the NPB Project's general contractor, hired Progressive as the plumbing sub-contractor in the NPB Contract for a total contract value of $4,684,257.[4] Progressive was expecting periodic payments under the parties' agreed Schedule of Values.[5]

Progressive started working on the NPB Project on October 19, 2014, and gave Kast a letter of bondability on October 29, 2014.[6] Progressive, however, had trouble securing a payment and performance bond as required by Article 10 of the NPB Contract.[7] After Progressive had exhausted its bonding options, on January 28, 2015, Progressive notified Kast it could not get a bond.[8] Two days later, on January 30, 2015, Kast sent Progressive a default letter giving Progressive 48 hours to get a bond and cure the default (the "Default Letter").[9] Kast took no immediate action to terminate Progressive's work on the NPB Project but, instead, encouraged Progressive to keep working on the NPB Project through March 10, 2015.[10]

After learning Progressive would *never* get a bond, Kast, through its project manager, MacDonald, closely monitored Progressive's work and convinced Progressive they would be

---

[4] Plaintiff's Ex. 1; Doc. No. 71, Ex. C, No. 9. ("Joint Stipulated Facts").
[5] Tr. 54:19-24, 57:8-12; Doc. No. 71, Ex. C, No. 11 (Kast approved the Schedule of Values at the time the NPB contract was signed).
[6] Doc. No. 71, Exh. C, No. 14.
[7] Plaintiff's Ex. 1, p. 5 ("In addition to all other conditions of payment under Article 3, 4, and 5, the provision of all payment and performance bonds and copies all required insurance policies, properly executed and all formalities met, together with all riders and attachments required at law or by the Contract Documents shall be a condition precedent to any payment to become due to Sub-Contractor by Contractor hereunder.").
[8] Plaintiff's Ex. 2; Doc. No. 71, Ex. C, No. 15; Tr. 35:16-36:1, 87:21-88:12, 165:17-166:17.
[9] Plaintiff's Ex. 2; Doc. No. 71, Ex. C, No. 16; Tr. 297:1-7.
[10] Plaintiff's Ex. 9 (Mr. MacDonald wrote on February 26, 2015, "please follow up with me if you do not receive the ACH deposit in the next few days."); Tr. 39:15-40:4, 43:11-44:25, 167:7-168:25, 176:16-178:1.

paid if they continued to work on the NPB Project.[11] MacDonald, through his subordinate Krista Phillips, for example, requested additional information from Progressive about its pending pay requests more than two weeks after the Default Letter was sent.[12] Kast intentionally conveyed the impression that, if Kast received this additional information supporting Progressive's pay requests, Kast would pay Progressive for work already and to be performed.[13] Kast never intended to pay Progressive, however, and was just stringing Progressive along to get more free work out of them on the NPB Project with the over-arching goal of keeping plumbing work continuing on this complicated project at a critical time.[14]

While Kast kept asking Progressive for more information to justify Progressive's pending pay requests, Kast simultaneously agreed with Progressive to vary the NPB Contract to structure a different pay arrangement at a substantial disadvantage to Progressive.[15] Kast and Progressive agreed that, instead of using the Standard of Values attached to the NPB Contract, Progressive's payment would equal Progressive's cost plus a 20% markup (or "Cost+20%").[16] I specifically find that Kast modified the contract to delete the provision in the NPB Contract that Progressive first had to get a bond as a condition precedent for receiving payment.[17] Why would Progressive agree to take a substantially lesser payment amount if it was not with the understanding they were to be paid for their completed work albeit at a lower rate?

---

[11] *Id.*; *see also* Plaintiff's Ex. 8, 9, 20.

[12] Plaintiff's Ex. 7; Tr. 42:17-18.

[13] *Id.*; *see also* Tr. 39:15-40:4, 43:11-44:25, 167:7-168:25, 176:16-178:1.

[14] *See* Plaintiff's Ex. 53.

[15] Plaintiff's Ex. 7, 9; Tr. 55:1-12, 168:2-19.

[16] Doc. No. 71, Ex. C, No. 21; Tr. 243:19-25. The record admittedly varies as to whether the parties agreed to a Cost + *15%* standard or a Cost + *20%* standard. I conclude that the parties ultimately accepted a Cost + 20% standard. But, this finding is somewhat irrelevant, because ultimately, I conclude Progressive should receive payment as calculated under the Standard of Values as originally agreed by the parties.

[17] *Id.*; *see also* Tr. 39:15-40:4, 43:11-44:25, 167:7-168:25, 176:16-178:1, 298:9-18.

Based on this new understanding, Progressive billed Kast $239,550.30 prior to Progressive's termination.[18] MacDonald, again buttressing the false facade that Kast intended to pay Progressive for its work, approved these revised pay requests.[19] MacDonald regularly and repeatedly promised Progressive that payment was forthcoming.[20] He even claimed an ACH deposit was pending.[21] When MacDonald made these assurances, he was aware Kast never intended to pay Progressive, as confirmed by the testimony of Mr. Whitman, Kast's Chief Financial Officer.[22]

While MacDonald was reducing Progressive's pay calculation, promising payment, and encouraging Progressive to keep on working on the NPB Project, Kast actively was looking for a new plumbing sub-contractor.[23] As early as February 11, 2015, Kast issued invitation to bids.[24] Kast never informed Progressive it was looking for a replacement plumbing sub-contractor.[25] On March 10, 2015, Progressive was told in a telephone call it was barred from the NPB job site.[26] On March 11, 2015, Kast emailed Pinnacle announcing it was selected as the new plumbing sub-contractor.[27] On March 13, 2015, Kast delivered a written letter of termination to Progressive.[28] Kast's written termination included no 48-hour cure and notice period as required by Article 26 of the NPB Contract.[29]

---

[18] Doc. No. 71, Ex. C, No. 25; Progressive would have earned $278,058.22 under the Schedule of Values agreed to in the NPB Contract.

[19] *Id.* at No. 26.

[20] Plaintiff's Ex. 9; Tr. 43:6-8, 46:6-10.

[21] Plaintiff's Ex. 9.

[22] Tr. 130:13-16.

[23] Tr. 183:24-185:2.

[24] Plaintiff's Ex. 35.

[25] Tr. 183:10-20, 183:24-185:2, 255:10-25.

[26] Tr. 118:12-14.

[27] Plaintiff's Ex. 17.

[28] Plaintiff's Ex. 12.

[29] *Id.*; *see also* Plaintiff's Exh. 1 ("[A]fter giving Subcontractor an additional forty-eight (48) hours written notice (at any time following the expiration of the initial forty-eight (48) hour notice and curative period), terminate this Subcontract, without thereby waiving or releasing any rights or remedies against Subcontractor or its sureties….").

Kast refused to allow Progressive to retrieve equipment left on the NPB site, including the Booster Pump Kast kept on the premises and continued to use.[30] Kast does not dispute Progressive's work on the NPB Project was satisfactory. Kast also agrees Progressive's pay applications and the related calculations are correct.[31] Kast just asserts it has no obligation to pay Progressive because it never got a bond,[32] even though Kast does not dispute Progressive completed 100% of the work required of it from October 19, 2014, through March 10, 2015.[33]

Kast argues Progressive simply should never have worked until they got a bond and ignores the established facts that Kast manipulated and deceived Progressive into continuing work on the NPB Project when Kast had no intention of paying them for their services.[34] Progressive offers five legal theories to support a logical ruling that Kast now must pay Progressive: (1) the parties agreed to modify the NPB contract to delete the provision requiring a bond as a condition precedent for payment, (2) waiver, (3) estoppel, (4) fraudulent inducement, and (5) negligent representation. I now will not discuss each theory.[35]

***Contract Modification***. Kast through the actions of its project manager, MacDonald, agreed to modify the terms of the NPB Contract by forgiving Progressive's requirement to get a bond as a condition precedent to payment.[36] MacDonald had actual and apparent authority to modify the NPB contract.[37] The modification is straightforward: Kast, in consideration and exchange for the Progressive invoicing at Cost+20% rather than under the more costly Standard

---

[30] Tr. 48:9-13, 180:19-23, 198:25-199:16.

[31] Doc. No. 71, Ex. C, No. 18-22.

[32] Tr. 130:4-16.

[33] Tr. 41:5-8, 54:22-25, 56:14-18.

[34] Plaintiff's Ex. 53; *see also* Tr. 39:15-40:4, 43:11-44:25, 167:7-168:25, 176:16-178; Plaintiff's Ex. 7, 8, 9, 20.

[35] The Court does not need to rule on the count alleging negligent misrepresentation because I ultimately conclude Kas made fraudulent misrepresentations to induce Progressive to continue working on the NPB project.

[36] Plaintiff's Ex. 9; Tr. 43:6-8, 46:6-10; MacDonald Depo. 133:1-12, 133:18-25, 134:1-10, 140:10-22. The parties agree Kast did not agree to release Progressive's obligation to get a payment and performance bond. Progressive was contractually obligated to get this bond, and its termination was not wrongful. Kast, however, did agree to modify the contract to delete the requirement of a bond as a condition precedent to payment and for work completed by Progressive.

of Values methodology, would keep a plumbing sub-contractor working on the job and save money, even though Progressive had no bond.[38] Progressive continued working and submitted its Cost+20% pay requests relying on this contractual modification and MacDonald's promises.[39] Kast approved those pay applications but never paid or intended to pay Progressive for its work.[40]

Even if a modification is not reduced to writing, as is the case here, I can easily infer the terms and scope of the modification through the conduct of Kast and MacDonald.[41] The modification is enforceable although the parties signed no new agreement.[42] Although Section 30(c) of the NPB contract provides the subcontract may not be changed except as provided in writing, under Florida law, "written contracts can be modified by subsequent oral agreement of the parties even though the written contract purports to prohibit such modification."[43] "A written contract or agreement may be altered or modified by an oral agreement if the latter has been accepted and acted upon by the parties in such manner as would work a fraud on either party to refuse to enforce it."[44]

Here, there is substantial evidence of the modification to Cost+20%, which was conditioned on Progressive getting paid for the work it had performed.[45] Again I ask, had Progressive known Kast had no intention of paying Progressive for its agreed satisfactory work using the pretext of the contractual language requiring the bond as a condition precedent, it never would have agreed to the Cost+20% pay reduction/modification and immediately would have

---

[37] Tr. 296:23-25.
[38] Plaintiff's Ex. 53, p 3.
[39] Tr. 168:20-22.
[40] Plaintiff's Ex. 53.
[41] *See J. Lynn Const., Inc. v. Fairways at Boca Golf & Tennis Condo. Ass'n, Inc.*, 962 So. 2d 928, 930 (Fla. 4th DCA 2007).
[42] *See Prof'l Ins. Corp. v. Cahill*, 90 So.2d 916, 918 (Fla.1956)
[43] *Id.*
[44] *Id; see also* Plaintiff's Ex. 1.

stopped working.[46] Progressive incurred substantial additional labor and other costs by continuing to work on the NPB Project after January 28, 2015, when Progressive told Kast they could not get a bond.[47]

Kast, however, now wants to have its cake and eat it too. They wanted to keep the NPB Project moving but knew that the project would stop until Kast could find a replacement plumbing sub-contractor if they immediately terminated Progressive after learning they could not get a bond.[48] Kast wanted to avoid a work stoppage at all costs and created a web of lies to make Progressive believe that, by accepting a lower payment, Kast would modify the contract to delete the requirement of a bond as a condition precedent to payment.[49] Kast connived to get Progressive to perform excellent work up to the day they were kicked-off the job.[50] Now, Kast wants to benefit from the value of this work without paying Progressive as agreed.[51] And, to rely on another adage, it is time for Kast to "pay the piper," or in this case, "the plumber."

Kast agreed to pay Progressive for its completed work regardless of whether Progressive got a bond.[52] Given Kast's unethical conduct and deceptive practices, Kast properly should pay what was originally owed to Progressive under the Standard of Values, not the reduced Cost + 20% calculation. That amount is $278,058.22. This payment amount is adjusted downward by $92,463.59 for two reasons: (1) Vendor invoices totaling $71,082.30 were received after Progressive was terminated;[53] and (2) After comparing *similar* contract terms in the Progressive and the Pinnacle contracts, Kast had to pay the substitute plumbing sub-contractor $21,381.29

---

[45] Plaintiff's Ex. 7, 9; Tr. 55:1-12, 168:2-19, 243:19-25.
[46] Tr. 38:1-16, 45:6-8, 254:21-24.
[47] *Id.*
[48] *See, e.g.*, Plaintiff's Ex. 9; Tr. 43:6-8, 46:6-10, 130:13-16.
[49] *See* Plaintiff's Ex. 53.
[50] Plaintiff's Ex. 7, 8, 9, 20; Tr. 42:17-18.
[51] Tr. 45:11-15, 175:25-176:10, 301:25-302:9; MacDonald Depo. 41:16-42:15.
[52] Plaintiff's Ex. 9.
[53] Plaintiff's Ex 55; Tr. 59:16-60:25.

*more* under Pinnacle's bid.[54] Therefore, Kast owes Progressive $185,594.63 ($278,058.22 - $92,463.59) under the NPB Contract.

Kast's argument that the Statute of Frauds, Chapter 725.01, *et seq.*, applies to the NPB Contract is meritless. Progressive performed the NPB Contract *as modified* until the day it was terminated precluding Defendants from relying on the Statute of Frauds as a defense.[55] "The statute of frauds also may not be invoked where nonperformance of a contract's original terms has been occasioned by an oral modification and the contract as modified has been fully performed."[56] Kast cannot avoid its obligation to pay Progressive for its services simply because no signed written modification exists, when Kast substantially benefitted from Progressive's work and its failure to pay would cause an undeserved windfall for Kast.[57]

Kast's other affirmative defenses relating to the NPB Contract also fail. The Second and the Third Affirmative Defenses state Progressive does not have standing and it is barred by the doctrine of *res judicata* because the torts claims arose prior to the commencement of the Chapter 11 bankruptcy and were not scheduled or disclosed. Progressive rebuts it was unaware of the fraud claim at the outset of the bankruptcy.[58] The Schedules were prepared by Ms. Sapp, who is not a lawyer and who the Court found to be a credible witness.[59] Any nondisclosure was entirely inadvertent and Progressive did not intend to make a mockery of the judicial system.[60] To the contrary, Progressive disclosed the breach of contract claims and Kast fully knew of these claims and of the bankruptcy proceedings.[61]

---

[54] Plaintiff's Ex. 20, 38, 55; Tr. 196:24-197:8; *see also* Doc. No. 100.
[55] Plaintiff's Ex. 53; Tr. 130:13-16.
[56] *Gerry v. Antonio*, 409 So. 2d 1181, 1183 (Fla. 4th DCA 1982) (citing *W.B.D., Inc. v. Howard Johnson Co.*, 382 So. 2d 1323 (Fla. 1st DCA 1980)).
[57] *Id.*; *see also* Tr. 55:1-12, 168:2-19.
[58] Doc. No. 100.
[59] Tr. 72:10-73:13.
[60] *See, e.g.*, *Slater v. United States Steel Corp.*, 871 F.3d 1174, 1185 (11th Cir. 2017).
[61] Plaintiff's Ex. 20, 42, 75.

The Fifth Affirmative Defense states Progressive is precluded from recovery under the contract with Kast because its prior breach released Kast from performance. This argument has no merit. Kast modified the contract knowing that Progressive had not obtained a bond.[62] Any breach was not material insofar as Kast actively solicited Progressive to continue working on the job without a bond.[63] Both the contract modification and the active solicitation overrode the requirement to get a bond as a condition precedent to payment. Kast cannot now hide behind the technical language of the contract to excuse their obligation to pay for services provided by Progressive.

*Waiver*. The Court alternatively finds Kast waived the NPB Contract's condition precedent to payment. "Waiver is defined as an intentional relinquishment or abandonment of a known right or privilege or conduct that warrants an inference of the intentional relinquishment of a known right."[64] Courts look at these elements to determine whether waiver is present: "(1) the existence at the time of the waiver of a right, privilege, advantage, or benefit that may be waived; (2) the actual or constructive knowledge thereof; and (3) an intention to relinquish that right, privilege, advantage or benefit."[65]

Kast and MacDonald are deemed aware of the Contract's payment conditions because "Florida adheres to the principle that a 'party has a duty to learn and know the contents of a proposed contract before [s]he signs' it.'"[66] Despite their knowledge of these conditions, Kast still orally modified the contract to the Cost+20% pay reduction and encouraged Progressive to submit revised pay applications to keep Progressive working on the NPB Project.[67] Progressive

---

[62] Plaintiff's Ex. 2, 59; Tr. 39:15-40:4, 42:17-18, 43:11-44:25, 167:7-168:25, 176:16-178:1.
[63] Plaintiff's Ex. 7, 8, 9, 20; Tr. 39:15-40:4, 42:17-18, 43:11-44:25, 167:7-168:25, 176:16-178:1.
[64] *Destin Sav. Bank v. Summerhouse of Fwb*, 579 So. 2d 232, 235 (Fla. 1st DCA 1991).
[65] *Id*.
[66] *Id*.
[67] Plaintiff's Ex. 7, 8, 9, 20, 53; *see also* Tr. 39:15-40:4, 43:11-44:25, 167:7-168:25, 176:16-178, 300:9-301:24; MacDonald Depo. 132:15-133:12, 140:10-22.

informed Kast it could not obtain its performance bond, and Kast encouraged Progressive to continue working even though it could not obtain the bond.[68] Therefore, even if Kast could have relied on the bonding condition to avoid paying Progressive, it waived that condition by its statements and actions indicating it would pay Progressive.[69]

**Estoppel.** Kast also is estopped from arguing Progressive should not be paid for the work it performed.

> The elements of estoppel are: (1) the party against whom estoppel is sought must have made a representation about a material fact that is contrary to a position it later asserts; (2) the party claiming estoppel must have relied on that representation; and (3) the party seeking estoppel must have changed his position to his detriment based on the representation and his reliance on it.[70]

Said another way, "[e]stoppel rests on the premise that the party asserting the estoppel has acted in reliance upon the prior inconsistent conduct."[71]

Kast indicated Progressive would be paid, made requests for information consistent with that promise, and never told Progressive it would not be paid for the work it performed.[72] On February 26, 2015, for example, Kast emailed Progressive stating Progressive's pay applications were approved and that an ACH payment was forthcoming.[73] Kast induced Progressive to keep working without pay by telling Progressive it would be paid, hiding the fact Kast was seeking a replacement contractor and never intending to pay Progressive.[74]

Progressive continued working diligently because it expected to get paid based on those express representations.[75] There is no doubt Progressive relied on those material

---

[68] Plaintiff's Ex. 53.
[69] Tr. 39:15-40:4, 43:11-44:25, 167:7-168:25, 176:16-178.
[70] *Goodwin v. Blu Murray Ins. Agency, Inc.*, 939 So. 2d 1098, 1103 (Fla. 5th DCA 2006) (citing *Watson Clinic, LLP v. Verzosa*, 816 So. 2d 832, 834 (Fla. 2d DCA 2002).
[71] *Id.* (citing *Pelican Island Property Owners Ass'n, Inc. v. Murphy*, 554 So. 2d 1179, 1181 (Fla. 2d DCA 1989)).
[72] Tr. 43:6-8, 46:6-10
[73] Plaintiff's Ex. 9.
[74] Tr. 46:15-47:3, 130:13-16, 180:24-181:7, 183:25-184:6.
[75] Tr. 45:3-8, 55:1-12, 168:2-19, 248:3-9.

representations.[76] Progressive would not have agreed to the modification of the NPB Contract to Cost +20% and it would not have agreed to work for free.[77] Had Progressive been told it was being terminated without ever being paid, it would have left immediately.

**_Fraudulent Misrepresentation_**. Lastly, Kast perpetrated a fraud against Progressive by inducing Progressive to continue working under the false assumption that Progressive would be paid for its work all-the-while knowing that Kast would not pay Progressive.[78] The elements of fraudulent representation under Florida law include: "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation."[79] The allegations made by Kast and by MacDonald, acting as the company's representative,[80] satisfy these requirements.

As testimony showed, MacDonald falsely told Progressive they would be paid if they agreed to a Cost+20% methodology.[81] MacDonald made this misrepresentation knowing Kast never intended to pay Progressive.[82] I find the evidence showed Kast never intended to pay Progressive but induced them to work to increase their bottom line and to keep the project moving.[83] Clearly, Progressive was harmed by the non-payment.

Kast knew or should have known these representations were false.[84] MacDonald, for example, testified that he is familiar with Kast's accounting department's payment procedures.[85]

---

[76] *Id.*

[77] *Id.*

[78] Plaintiff's Ex. 7, 8, 9, 20, 53; Tr. 130:13-16.

[79] *Mink v. Smith & Nephew, Inc.*, 860 F.3d 1319, 1332 (11th Cir. 2017) (quoting *Butler v. Yusem*, 44 So.3d 102, 105 (Fla. 2010)).

[80] *See* Doc. No. 71, Ex. C, Nos. 3, 8 (MacDonald is Kast's authorized officer and agent for the NPB Project).

[81] Tr. 298:9-13.

[82] *See* Plaintiff's Ex. 53.

[83] *Id.*

[84] *See Mink*, 860 F.3d at 1332–33.

He knew that the accounting department would not approve payment without a bond because the lack of a bond is a "Red Flag" preventing payment.[86] Nonetheless, he encouraged Progressive to look forward to an ACH deposit while claiming that he was "sympathetic" to Progressive's "business issues" and that he would continue to work with them.[87]

MacDonald's testimony he promised the ACH deposit on February 26, 2015, only because he was not sure Progressive could not obtain a bond was not credible.[88] MacDonald and Kast received Progressive's notice it could not get a bond on January 28, 2015, and they knew Progressive would not get a bond, which is why Kast and MacDonald immediately started looking for a new plumbing sub-contractor as early as February 11, 2015.[89] The evidence shows that as late as March 5, 2015, MacDonald met with Bill Lawson to assure him Progressive would get paid for further work on the project.[90]

When asked in an email by Mike Utley why Kast would pay Progressive when they were in default lacking a bond, MacDonald responded in July 23, 2015: "We weren't going to. I was minimizing the approved amount of their claim against us. I think the total pay apps amount to approx. $160K as opposed to over $200K. I didn't want to have approved pay apps that exceeded the value of the work in place."[91]

These false misrepresentations induced Progressive to continue working until March.[92] Progressive reasonably relied on these misrepresentations, and due to this fraud, Progressive was severely damaged because it outlaid costs for materials, labor, and other overhead for half of a

---

[85] Tr. 325:6-327:16
[86] *Id.*
[87] Plaintiff's Ex. 9, 36.
[88] Tr. 351:21-352:11,  352:12-354:5.
[89] Plaintiff's Ex. 2, 35; *see also* Tr. 351:21-352:11,  352:12-354:5.
[90] Tr. 246:14-248:6,  280:2-20.
[91] Plaintiff's Ex. 53.
[92] Tr. 55:1-12,  168:2-19;  *See Mink*, 860 F.3d at 1332–33.

year and received nothing in return.[93] In conclusion, Kast owes Progressive $185,594.63 under the NPB Contract. A Partial Final Judgment for Progressive and against Kast shall be entered for this amount.

### Kast Owes Progressive $38,000 under the STP Contract

Progressive had worked with Kast on at least one earlier project, a similar but smaller luxury, water-front condominium development in St. Petersburg, Florida.[94] Progressive signed the contract with Kast on May 20, 2013 (the "STP Contract").[95] Progressive timely completed all work on this project, but the Court finds that Kast has not paid Progressive the balance of $38,000[96] due out of a total contract value of $1,328.250.[97]

Kast in defense claims Progressive failed to complete warranty work on the STP Project.[98] Kast, however, provided no credible evidence to substantiate any specific uncompleted warranty work or its value.[99] The Court finds Progressive completed all its required plumbing work on the STP Project, including any warranty work, and is entitled to $38,000.[100]

Kast speciously argued during this litigation it somehow could set-off the $38,000 due under the STP Contract against monies owed by Progressive to Kast under the NPB Contract.[101] This argument has no merit. Kast never made a claim against Progressive for *any* monies due under the NPB Contract. It never filed a proof of claim in this confirmed Chapter 11 case and any claim Kast previously may have had against Progressive evaporated when the bar date

---

[93] *Id.*
[94] Plaintiff's Ex. 14.
[95] *Id.*
[96] Tr. 24:2-14, 68:10-16, 198:18-21, 257:12-16. Kast owes at least $25,000 for unpaid pay requests under the STP Contract and at least $13,000 for unpaid but approved change orders. Tr. 257:17-18.
[97] Plaintiff's Ex. 14.
[98] Tr. 138:25-139:5.
[99] *See, e.g.*, Tr. 286:2-24.
[100] Tr. 24:2-14, 198:5-13; 260:5-7.
[101] Plaintiff's Ex. 55, 57; Tr. 139:14-21, 313:13-314:8. MacDonald further admitted that Kast was going to pay Progressive for its work on STP so long as the owner of the NPB Project paid Kast the difference between Pinnacle and Progressive's contract, which it did pursuant to the Owner's Change Order.

passed to file claims. Kast has NO viable legal claim against Progressive. So what monies would act as a setoff?

But, even if a set-off claim exists, Kast failed to raise such a claim in its pleadings. "It is well settled in contract actions that set-off is an affirmative defense that must be pleaded, or it is waived."[102] "It is well settled in contract actions that set-off is an affirmative defense...."[103] Kast owes Progressive $38,000.[104] Kast's failure to timely pay Progressive is a material breach of the STP Contract as it was the only consideration Progressive expected in exchange for its work and goes to the essence of the parties' agreement.[105]

Progressive satisfactorily completed its work on the STP Project, and no remaining warranty or unsatisfactory work was proven.[106] In conclusion, under Count IV of Progressive's Complaint, Kast owes Progressive $38,000 under the STB Contract. A Partial Final Judgment for Progressive and against Kast shall be entered for $38,000.

### **Kast Owes Progressive $15,000 plus Interest for Failing to Return the Booster Pump**

In Counts I and II of the Complaint, Progressive argues Kast failed to turnover and has converted its Booster Pump. The Chief Executive Officer of Progressive, Bill Lawson, invented and produced this specially designed temporary booster system to use on their job sites where the company works on multi-story buildings.[107] The pump keeps the pressure regulated during the

---

[102] *Felgenhauer v. Bonds*, 891 So. 2d 1043, 1045 (Fla. 2d DCA 2004)(citing *Parker v. Priestley*, 39 So.2d 210, 213 (Fla. 1949); *Coffin v. Talbot*, 110 Fla. 131, 148 So. 184, 187 (1933); *Skaf's Jewelers, Inc. v. Antwerp Import Corp.*, 150 So.2d 260, 262 (Fla. 2d DCA 1963); *Jojo's Clubhouse, Inc. v. DBR Asset Mgmt., Inc.*, 860 So.2d 503, 504 (Fla. 4th DCA 2003)).

[103] *KMS Rest. Corp. v. Wendy's Int'l Inc.*, 194 Fed. Appx. 591, 598 (11th Cir. 2006); *Tavormina v. ITT Commercial Fin. Corp.*, 115 B.R. 720, 722 (Bankr. S.D. Fla. 1990) ("the issue of setoff is a compulsory claim which must be timely raised by proper pleading") (citing *Chapes, Ltd., v. Anderson (In re Scaife)*, 825 F.2d 357, 362 (11th Cir. 1987)).

[104] Tr. 67:11-25,  68:25-69:5.

[105] *See Hamilton v. SunTrust Mortg. Inc.*, 6 F. Supp. 3d 1300, 1309 (S.D. Fla. 2014) (citing *Covelli Family, L.P. v. ABG5, L.L.C.*, 977 So. 2d 749, 752 (Fla. 4th DCA 2008)).

[106] Tr. 24:2-14,  68:10-16,  198:18-21.

[107] Tr. 261:19-263:6.

construction phase.[108] This Booster Pump used on the NPB Project was made in 2008, cost $15,000 to make, and was essential equipment Progressive used in its work.[109]

Kast refused to allow Progressive access to the NBP work-site to retrieve the Booster Pump after March 10, 2015.[110] Progressive demanded the return of the Booster Pump but Kast refused.[111] The Court specifically finds that a Kast employee told Progressive that, if they sent someone to retrieve the Booster Pump, Kast would arrest the Progressive employee for trespassing.[112] So, when Kast continued to use and was benefited from the pump, it also was threatening Progressive with arrest if it retrieved its own property.[113]

Progressive had no option but to file a motion in the main bankruptcy case seeking a court order compelling Kast to surrender the Booster Pump to Progressive.[114] An Order directing Kast to give Progressive the Booster Pump was entered on June 28, 2016.[115] Kast already had kept the pump without Progressive's consent since March 10, 2015. Within a few days of the Order Directing Turnover, Progressive sent its project manager, George Kycyku, to the NPB Project site to pick up the Booster System.[116] Notwithstanding this Court's order, Kast refused to return the Booster Pump.[117] Mr. Kycyku was told Kast had "lost" the pump.[118]

The Court finds Kast's explanation for the disappearance of the Booster Pump unbelievable. The Booster Pump weighs at least a ton and is very large, approximately 4' x 6' in size, requiring a crane or forklift to move.[119] Such a large piece of equipment simply does not

---

[108] Tr. 262:11-21.
[109] Tr. 73:19-74:1, 263:7-9.
[110] Tr. 199:3-16, 265:1-14.
[111] Tr. 75:5, 265:15-20.
[112] Id.
[113] Tr. 261:22-262:21, 265:1-14.
[114] Doc. No. 285 in 6:15-bk-072575-KSJ.
[115] Doc. No. 358 in 6:15-bk-072575-KSJ.
[116] Tr. 266:10-15.
[117] Tr. 76:6-77:3, 266:16-23
[118] Id.
[119] Tr. 267:8-14.

just disappear. Kast's CFO Roger Whitman testified Kast did not believe it had any obligation to protect or return the Booster Pump to Progressive.[120] The Court reaches a darker, malevolent conclusion that Kast knowingly allowed the removal of the Booster Pump, perhaps for its destruction or perhaps for reuse on another job. This finding is based on my evaluation of the utter lack of credibility of the Kast witnesses.

Kast's only excuse for its failure to timely return the pump was that Progressive had waited too long to retrieve it.[121] As just held, Kast actively interfered with Progressive's ability to get the pump, by threatening to arrest anyone who attempted the retrieval and then permitting the removal of the pump from the site.[122] Progressive had no duty to "mitigate" Kast's active interference.[123] Even if Progressive had to mitigate, the burden falls upon Kast to affirmatively establish that failing to mitigate was unreasonable and aggravated the harm.[124] Kast adduced no evidence to meet this burden.

Kast converted the Booster Pump under Florida law. Florida courts recognize the common law tort of conversion. "Florida law defines 'conversion' as 'an unauthorized act which deprives another of his property permanently or for an indefinite time.'"[125] "[C]onversion occurs when a person asserts a right of dominion over chattel which is inconsistent with the right of the owner and deprives the owner of the right of possession."[126] "Under Florida law, the elements of conversion are (1) an act of dominion wrongfully asserted; (2) over another's property; and (3)

---

[120] Tr. 140:2-12.

[121] Tr. 77:4-19; Doc. No. 6, Kast's Fourth Affirmative Defense.

[122] Tr. 75:5, 265:15-20.

[123] *See*, e.g., *Moreau v. Oppenheim*, 663 F.2d 1300, 1312 (5th Cir. 1981) ("The Oppenheims are also inappropriate parties to claim the benefit of a duty to mitigate, since there was abundant evidence that the Oppenheims actively prevented the Moreaus from registering their horses with the Arabian Horse Registry of America").

[124] *Hale Container Line, Inc. v. Houston Sea Packing, Inc.*, 137 F.3d 1455 (11th Cir. 1998).

[125] *Brown v. Vega (In re Vega)*, 2014 Bankr. LEXIS 2612, at *12 (Bankr. M.D. Fla. June 12, 2014) (citing *Bar-Am v. Grosman (In re Grosman)*, 2007 Bankr. LEXIS 1844, at *54 (Bankr. M.D. Fla. May 22, 2007)).

[126] *Energy Smart v. Musselman (In re Energy Smart, Inc.)*, 381 B.R. 359, 377 (Bankr. M.D. Fla. 2007) (internal quotation marks and citations omitted).

inconsistent with his ownership therein."[127] Progressive established it was entitled to possession of the Booster Pump.[128] Kast, as found above, wrongfully exercised control over Progressive's property and failed to return it upon demand even upon court order.

The Booster Pump now is long gone, and Kast has violated this Court's order directing its turnover. Kast also has converted the property. Progressive is owed the cost of acquiring the pump when it was built plus interest.[129] The value of the pump is $15,000.[130] Progressive is entitled to interest calculated from the date Kast assumed wrongful possession of the Booster Pump, March 10, 2015, at the federal interest rate of 2.7%, which as of the entry of this Memorandum Opinion is $405 per annum. Interest will continue to accrue at the per diem rate of $1.11.

On Count I and II, the Court will enter a Partial Final Judgment for Progressive and against Kast for $15,000 plus interest of $1,529.

### MacDonald Has No Personal Liability to Progressive

MacDonald was an employee and agent of Kast but not a corporate office or director.[131] MacDonald acted as directed within the scope of his employment and as directed by Kast.[132] Although MacDonald signed the NPB contract as the "Senior Project Manager" of Kast,[133] no competent evidence was presented to support a claim that MacDonald was personally liable for a

---

[127] *TracFone Wireless, Inc. v. Hernandez*, 196 F. Supp. 3d 1289, 1299 (S.D. Fla. 2016) (internal quotation marks and citations omitted); *See also Craig v. Kropp*, No. 2:17-CV-180-FTM-99CM, 2017 WL 2506386, at *6 (M.D. Fla. June 9, 2017) (listing elements of conversion under Florida law).

[128] *Robinson v. Frese Hansen Anderson Anderson Heuston & Whitehead. P.A.*, No. 612CV1064ORL41DAB, 2015 WL 12843854, at *7 (M.D. Fla. Mar. 31, 2015).

[129] *See In re Ozark Rest. Equip. Co.*, 83 B.R. 591, 593 (Bankr. W.D. Ark. 1987) (holding that in lieu of the actual property, its fair market value should be turned over); *Stoumbos v. Kilimnik*, 988 F.2d 949, 957 (9th Cir. 1993) (Defendant was ordered to pay to the estate the market value of the vehicles at the time of the improper transfer, plus interest).

[130] Tr. 74:19-22; Tr. 264:9-20. Progressive argued Kast should pay what would be the value of the pump today. They estimated the pump would be worth it $25,000 but failed to substantiate this valuation testimony with evidence.

[131] *See* Doc. No. 71, Ex. C, Nos. 3, 8 (MacDonald is Kast's authorized officer and agent for the NPB Project).

[132] *See Cottle v. Storer Commc'n, Inc.*, 849 F.2d 570 (11th Cir.1988).

breach in the contract. "The entire document must be considered when determining 'whether the parties intended to bind their principal businesses alone, or also the signing agents in their individual capacities.'"[134]

Under Florida law, a court *may* hold a corporate *officer* liable for committing fraud while performing his or her duties.[135] Even though the Court found MacDonald actively participated in the fraud, I will use my discretion and find no personal liability to him. MacDonald was not an officer of Kast, but an employee, and no evidence was presented that he personally benefitted from his actions beyond and separate from keeping his job with Kast.[136] A Partial Final Judgment against Progressive shall be entered finding no personal liability as to MacDonald.

### Calculation of Partial Final Judgment and Award of Attorneys' Fees and Costs

As to fees and costs, on or before February 1, 2019, Progressive if desired, shall submit additional briefing on Progressive's entitlement to attorney's fees under the NPB and STP[137] contracts including an affidavit detailing requested attorney's fees and costs. Kast may file an objection if desired, no later than March 1, 2019. The Court then will take the fees/ costs under advisement and enter the Final Judgment.

Accordingly, it is,

**ORDERED:**

1. Kast owes Progressive $185,594.63 under the NPB Contract.

2. Kast owes Progressive $38,000 under the STP Contract.

3. Kast Owes Progressive $16,529 for failing to return the Booster Pump.

4. Michael MacDonald has no persona liability to Progressive.

---

[133] Plaintiff's Ex. 1.
[134] *Frieri v. Capital Inv. Servs., Inc.*, 194 So. 3d 451, 454–55 (Fla. Dist. Ct. App. 2016), *reh'g denied* (June 16, 2016) (citing *MacKendree & Co., P.A. v. Pedro Gallinar & Assocs., P.A.*, 979 So.2d 973, 976 (Fla. 3d DCA 2008)).
[135] *Home Loan Corp. v. Aza*, 930 So. 2d 814, 815 (Fla. Dist. Ct. App. 2006).

5. A Partial Judgment is awarded for Progressive and against Kast for $240,124, which shall bear interest of 2.70% per annum.

6. Progressive shall have until February 1, 2019, to submit a fee affidavit, and any legal memorandum.

7. Kast shall March 1, 2019, to file an objection. The matter will be taken under advisement, and a Final Judgment shall issue.

### 

The Clerk is directed to serve a copy of this order on interested parties who are non-CM/ECF users.

---

[136] *See, e.g.*, *Fulton v. Brancato*, 189 So. 3d 967, 969 (Fla. Dist. Ct. App. 2016).
[137] Plaintiff's Ex. 1, 14.